UNITED STATES OF AMERICA
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,      )
                               )
        v.                     )      Case No. 3:06-00021
                               )      Judge Echols
CHRISHANTY SHANTEL MARTIN.      )

MEMORANDUM

Pending before the Court is Defendant Chrishanty Martin's "Motion for Suppression of Illegally Seized Evidence" (Docket Entry No. 18). The Court held an evidentiary hearing on the Motion on October 10, 2006, after which the parties submitted proposed findings of fact and conclusions of law.

I.  FACTUAL FINDINGS

During the course of the evidentiary hearing, the Court heard from numerous witnesses. Having heard the testimony of the witnesses, after considering their interests and demeanor, the Court finds the following to be the relevant facts.[1]

On January 1, 2006, Anthony Hall ("Deputy Hall") and Jonathan Stephens ("Deputy Stephens"), Rutherford County Sheriff's deputies,

_____

[1] Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Additionally, during the course of the evidentiary hearing, the Court heard testimony about matters relating to what occurred after Deputy Stephens made his initial sweep of the residence. Because these matters are irrelevant given this Court's ultimate conclusion, they will be briefly addressed in this statement of facts to place the entire incident into perspective.

1

were on routine uniformed patrol in separate vehicles when they heard a dispatch about a "welfare check" at approximately 1:51 p.m. The dispatch arose after the Murfreesboro Police Department received a 911 call from a cell phone which was transferred to the Rutherford County Sheriff's Department. The caller identified herself as Christina Beasley ("Beasley") and yelled or screamed that drugs were either being sold or used at an unidentified residence. The dispatcher was not provided with the precise address, but a trace indicated that the address was either 5982 or 5987 Hickory Grove Road.

At approximately 1:57 p.m., Deputies Hall and Stephens arrived simultaneously at 5982 Hickory Grove Road. As the officers entered the driveway in their separate marked police units, they observed a maroon pickup truck trying to back out of the driveway. The officers pulled in behind the pickup, blocking its exit and turned on their lightbars.

The pickup was occupied by a white male driver (later identified as Bryan Adkins ("Adkins")) and a black male passenger (later identified as Barney Martin ("Barney Martin")). Defendant Chishanty Martin was standing in the front yard. Defendant and Barney Martin are cousins.

Both officers exited their vehicles and Deputy Stephens told Deputy Hall to approach the individuals in the pickup to see what

2

was going on. Deputy Stephens testified he saw Defendant "moving very rapidly for a man his size" towards the front door of the residence, although the record is unclear if Defendant was walking fast, jogging, or running.

When Deputy Stephens first observed Defendant, he was approximately thirty to thirty-five yards away. Deputy Stephens yelled for Defendant to stop but Defendant continued towards the house so Deputy Stephens ran after him, rapidly closing the gap[2] between them. Deputy Stephens did not want Defendant to enter the home because he did not know if Defendant had a weapon on him or inside the residence.

Defendant entered the house before Stevens arrived. When Deputy Stephens reached the doorway, Defendant tried to slam the door but Deputy Stephens drew his weapon and used his body to push the door open. As Deputy Stephens entered the home, Defendant, who had made his way through the living room, was at the entrance to the kitchen and had his back to the deputy. Deputy Stephens saw Defendant "fidgeting with his hands," but did not see anything in his hands. Defendant then turned around and walked towards Deputy Stephens with his hands in the air.

_____

[2]Deputy Stephens testified he runs a 40-yard dash in 4.29 seconds.

3

Defendant insisted that the two should step outside the residence. However, Deputy Stephens told Defendant he wanted to "clear the residence," i.e. make sure that no one else was in the residence who could shoot at the officers. Defendant reportedly told him to "go ahead." Defendant was not under arrest at this time.

Deputy Stephens began to walk through the residence, telling Defendant to stay in the front doorway or go outside. As Deputy Stephens was approaching the kitchen, he heard the door open and turned to see Barney Martin, the passenger from the pickup truck, in the back bedroom of the house. Deputy Stephens aimed his weapon at Barney Martin and told him to go outside. Barney Martin complied. He was not placed under arrest.

In the process of clearing the house, Deputy Stephens looked in the kitchen and saw on the hutch beside him small plastic baggies with their corners pinched-off and what appeared to be crack cocaine residue on the hutch. Deputy Stephens called out to Defendant who was standing in the front doorway as instructed. Deputy Stephens told Defendant he had been in the profession a long time, had dealt with a lot of drugs, and Defendant needed to be honest with him about the drugs and to whom they belonged.

Defendant told Deputy Stephens he liked to lace his marijuana with cocaine, whereupon Deputy Stephens asked him if there were any more drugs in the residence. Defendant told Deputy Stephens there

4

was a little bit of marijuana and, upon Deputy Stephens' request, Defendant reached into a bowl on the top of the hutch and pulled out ten grams of marijuana.

While those two were in the house, Deputy Hall questioned Adkins and Barney Martin who had exited the pickup in the front driveway. They told him that Ms. Beasley had been to the house "yelling and cursing," and had kicked Defendant's Ford Expedition. At some point during this conversation, Barney Martin walked away and went into the house. This did not concern Deputy Hall because Barney Martin was not under arrest. Deputy Hall testified "I didn't have a problem with [Barney Martin] going in the house" and "[a]t that point all I thought we were dealing with was a girlfriend who had come and vandalized the vehicle. So I felt it was okay for him to go in." (Hrg. Tr. at 28-29).

When Barney Martin exited the house on order of Deputy Stephens, he ignored Deputy Hall's order to come to the officer and instead proceeded to a fifty-five gallon trash drum on the side of the house and dropped something into it. He then walked over to Deputy Hall.

When Deputy Stephens exited the house at around 2:40 p.m., Deputy Hall asked him to watch the three individuals, Defendant, Barney Martin and Bryan Adkins, so he could go look in the trash can. Upon looking in the drum, Deputy Hall observed a set of

electronic scales with what looked to be cocaine residue lying on top of burnt ashes.  He retrieved the scale and asked Barney Martin about it.

Barney Martin admitted to placing the scale in the trash can after he came out of the house.  Deputy Hall frisked Barney Martin whereupon Barney Martin threw a crack pipe to the ground.  At that time, Barney Martin was arrested, cuffed and searched.  The search revealed two spoons with possible cocaine residue, some pieces of a Brillo pad and a push rod.  The pickup in the driveway belonging to Bryan Adkins was also searched, producing a cigarette box with 2.6 grams of cocaine inside, a crack pipe, and a five-dollar bill with some crack cocaine rolled up inside.  Barney Martin was placed in the back of Deputy Hall's cruiser at approximately 2:45 p.m.[3]

Just before Barney Martin was placed in the back of the police car, Defendant's mother, Martha A. Martin ("Ms. Martin"), arrived on the scene.  Detective Jeremy Weaver ("Weaver"), a narcotics officer, arrived at approximately 2:59 p.m.  He spoke with Defendant and his mother.  Ms. Martin told the detective she and her brother owned the house.  Detective Weaver was also informed that Defendant was living in Antioch at the time.

---

[3]Shortly after being placed in the vehicle, Barney Martin began yelling and kicked at the windows.  He managed to get out of the car but was quickly apprehended and placed back in the vehicle.

6

Detective Weaver told Ms. Martin he intended to get a search warrant if necessary and read to her a consent-to-search form. Ms. Martin testified that she signed the consent form only after the detective told her it would take several hours to get a search warrant. Ms. Martin could not wait several hours since she needed to go to work.

Ms. Martin consented to having her area and the common area of the house searched, but not the bathroom and two bedrooms used by her brother. Ms. Martin identified the rooms allowed to be searched. The search began at approximately 3:30 p.m. and lasted about one hour.

During the course of the search, after officers had found a small amount of crack cocaine on the kitchen windowsill, Defendant admitted the drugs were his and that there were more in the house which they would not find without his help. Defendant then went into a back bedroom, reached into a pile of dirty laundry, and pulled out a yellow plastic bag which contained several bags of crack cocaine and powder cocaine. Defendant then placed his hands in front of him as if he were ready to be cuffed. The Defendant was taken into custody at approximately 5:19 p.m.

Several things from the evidentiary hearing are worthy of note in regard to the Motion to Suppress. Defendant was not known to either Deputy Stephens or Deputy Hall at the time of their New

Year's Day encounter. The residence was not shown to have been in a high crime area. Though the responding deputies stated they were called for a "welfare check," the only thing they knew upon arriving at the scene was that a Christina Beasley had called and yelled that someone was selling or using drugs at some unspecified residence. Neither officer saw drug activity when they arrived at the first of the two possible houses, nor any other criminal activity.[4] Nobody was provided any *Miranda* warnings, nor placed under arrest until long after the police arrived when Barney Martin tossed the scales in the trash can. The evidence suggests that Deputy Stephens was in the house a very long time, as much as from thirty to forty minutes.[5] Nonetheless, Deputy Stephens testified that it took "a few minutes . . . not long at all" to clear the house. While Defendant may have told Deputy Stephens to "go ahead" when he asked to clear the house, Deputy Stephens was not given general consent to search the house until Defendant's mother arrived on the scene, approximately one hour after the arrival of police. There has been no adequate explanation as to the reason for Deputy Stephen's length of time in the house prior to consent having been given.

_____

[4]In fact, Deputy Hall testified that the first time he saw anything suspicious was when he found the scales in the trash can approximately forty minutes after his arrival.

[5]Deputy Hall's testimony suggests Deputy Stephens was in the house approximately 40 minutes. The dispatch log shows that Deputy Stephens called for narcotics detectives at 2:27, which was one-half hour after the deputies arrived on the scene.

Case 3:06-cr-00021   Document 25   Filed 11/22/06   Page 8 of 23 PageID #: 75

## II.  APPLICATION OF LAW

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures[.]" U.S. Const. amend. IV.  For a search or seizure to be reasonable, it generally must be effectuated pursuant to a warrant based upon probable cause.

One exception to this rule is the existence of exigent circumstances which arises where "real immediate and serious consequences" would occur if a police officer were to "postpone[] action to get a warrant."  Welsh v. Wisconsin, 466 U.S. 740, 751 (1984).  The Government does not argue exigent circumstances in this case, let alone shoulder the "heavy burden" of proving exigency. United States v. McClain, 444 F.3d 556, 562 (6th Cir. 2005).

Instead, the Government seeks to justify Deputy Stephens' initial actions under another exception to the warrant requirement – the so-called Terry stop under Terry v. Ohio, 392 U.S. 1 (1968). In Terry the Supreme Court held:

> where a police officer observes unusual conduct which
> leads him reasonably to conclude in light of his
> experience that criminal activity may be afoot and that
> the persons with whom he is dealing may be armed and
> dangerous, where in the course of investigating this
> behavior he identifies himself as a policeman and makes
> reasonable inquiries, and where nothing in the initial
> stages of the encounter serves to dispel his reasonable
> fear for his own or others' safety, he is entitled for
> the protection of himself and others in the area to
> conduct a carefully limited search of the outer clothing
> of such persons in an attempt to discover weapons which
> might be used to assault him.

9

Id. at 30.  Since Terry, the Supreme Court has expanded the scope

of a permissible Terry stop to "ask[ing] the detainee a moderate

number of questions to determine his identity and to try to obtain

information confirming or dispelling the officer's suspicions."

Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984).

The Sixth Circuit has recently reviewed the analytical

framework for a Terry stop, writing:

> "In evaluating the constitutionality of a Terry stop, we
> engage in a two-part analysis of the reasonableness of
> the stop." United States v. Davis, 430 F.3d 345, 354 (6th
> Cir. 2005).  We first ask 'whether there was a proper
> basis for the stop, which is judged by examining whether
> the law enforcement officials were aware of specific and
> articulable facts which gave rise to reasonable
> suspicion.'"  (quoting United States v. Garza, 10 F.3d
> 1241, 1245 (6th Cir. 1993)).  If the stop was proper,
> "then we must determine 'whether the degree of intrusion
> . . . was reasonably related in scope to the situation at
> hand, which is judged by examining the reasonableness of
> the officials' conduct given their suspicions and the
> surrounding circumstances.'" Id. (omission in original)
> (quoting Garza, 10 F.3d at 1245).

United States v. Caruthers, 458 F3d 459, 464 (6th Cir. 2006).  The

stop in this case fails both parts of the analysis.

A.  **Reasonable Suspicion**

The first prong of the analysis relates to the articulation of

reasonable suspicion.  While reasonable suspicion is an "elusive

concept," it nevertheless demands that "the detaining officers must

have a particularized and objective basis for suspecting the

particular person stopped of criminal activity."  United States v.

10

<u>Cortez</u>, 449 U.S. 411, 417-418 (1981).[6]  This is because the "demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence."  <u>Terry</u>, 392 U.S. at 22 n.18. Nevertheless, courts are to allow "officers to draw on their own experience and specialized training to make inferences and deductions about the cumulative information available to them that might well elude an untrained person."  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002).  Ultimately, in evaluating whether there was an objective basis for reasonable suspicion to stop an individual, a court is to look "at the totality of the circumstances – the whole picture."  <u>Cortez</u>, 449 U.S. at 417.

The totality of the circumstances does not suggest that Deputy Stephens had a particularized and objective basis for concluding that Defendant was (or even had been) engaging in criminal activity. The factors which informed Officer Stephens' decision to stop Defendant were limited at best.

The deputies had received a dispatch from someone who identified herself as Christina Beasley.  There is no suggestion

_____

[6]The <u>Terry</u> stop analysis applies even where a felony crime has been completed.  "If police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a <u>Terry</u> stop may be made to investigate that suspicion."  <u>United States v. Hensley</u>, 469 U.S. 221, 229 (1985).

11

that this individual was known by these officers, let alone that she was a credible individual. Even assuming Beasley was credible, all she reported was that "he" was using or selling drugs in the house. The officers had absolutely no description of the purported drug user or seller. Even the location of the house was not established by the call and the trace only narrowed the location to two different houses.

When the officers arrived on the scene, nothing was amiss. There was no evidence of criminal activity. All that was happening was that a pickup was beginning to back up the driveway and Defendant was in the front yard, rapidly headed towards the house. These circumstances, taken together, do not amount to reasonable suspicion for a stop within the meaning of <u>Terry</u>.

Supreme Court precedent lends support to this Court's conclusion that the officers in this case did not have reasonable suspicion to stop and detain Defendant. In <u>Florida v. J.L.</u>, 529 U.S. 266 (2000), "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." <u>Id</u>. at 268. The police arrived and found a young man matching that description and a subsequent frisk revealed the presence of a gun. The Supreme Court concluded there was insufficient "indicia of reliability" to support a <u>Terry</u> stop, even though the tipster described a person in some

12

detail, identified the particular bus stop where the person could be found, and alleged possession of a gun.  Id. at 268.

The information provided here was far less than that provided in J.L.  There was no report of what the alleged user or seller looked like, let alone an indication of age or race.  There was not even a precise location for where the allegedly unlawful activity was occurring.  And there was no indication of unlawful activity at the time the police arrived, only that a pickup was attempting to back out of the driveway and a male was standing in the yard who made a hasty retreat towards the house.

It is true that, unlike in J.L., the caller here was not anonymous because she provided her name.  However, she was not "a known informant whose reputation [could] be assessed."  Id. at 269.  In fact, the Government in this case concedes that "at the time of the call from dispatch, all Deputy Stephens knew was that an individual had reported there were drugs in the residence" and that "[t]here was no information in the call from Christina Beasley that would establish her basis of knowledge or reliability."  (Docket Entry No. 23 at 8).

Recognizing the shortcomings in the call to the dispatch center, the Government argues the Terry stop was valid because Defendant allegedly fled upon seeing the arrival of the police.  As the Government points out, the Supreme Court in Illinois v. Wardlow,

13

528 U.S. 119, 124 (2000), noted that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and "[h]eadlong flight – wherever it occurs – is the consummate act of evasion. It is not necessarily indicative of wrongdoing, but it is certainly suggestive of it." Id. at 125-26.

This Court rejects the Government's contention that the "flight" in this case justified the Terry stop. In the first place, it is not clear that Defendant was in "headlong flight" when he retreated towards the house where he was staying at the time. Deputy Stephens described him as "moving rapidly." This may be of some significance since "'the speed of the suspect's movements may be relevant in the totality of the circumstances,'" U.S. v. Caruthers, 458 F.3d 459, 466-67 (6th Cir. 2006) quoting, United States v. Gordon, 231 F.3d 750, 757 (11th Cir. 2000).

In any event, because an individual has a right to decline a police encounter, Florida v. Bostick, 501 U.S. 429, 437 (2006), Wardlow's discussion of "headlong flight" must not be read in a vacuum. In Wardlow, police officers converged in a four-car caravan in an area known for heavy narcotics trafficking. The officers observed respondent Wardlow standing next to a building holding an opaque bag as they drove past. When Wardlow saw the officers, he began to run. The officers caught up with Wardlow, patted him down, and discovered a handgun. The Supreme Court upheld the search

14

under Terry, ruling that the officers were justified in suspecting that Wardlow was involved in criminal activity: "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." Wardlow, 528 U.S. at 124.

In this case, there is no evidence that Defendant was in what the police considered to be a high crime or heavy narcotics trafficking area or that there was anything happening which aroused the officer's suspicion other than Defendant's retreat towards the house. This is not enough for a Terry stop under Wardlow. See, United States v. Gholson, 181 Fed. Appx. 299, 302 (3d Cir. 2006)(emphasis in original)(without more, unprovoked flight under Wardlow is "not enough to justify a Terry stop. Presence in a high crime area *plus* unprovoked flight or some other indicia of wrongdoing, however, can give rise to reasonable suspicion"); United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006)("Flight from a lawful frisk or arrest can contribute to a finding of reasonable suspicion"); United States v. Aitoro, 446 F.3d 246, 253 (1st Cir. 2006)("Wardlow turned primarily on two factors: the defendant's presence in an area known for heavy narcotics trafficking and the defendant's 'headlong flight' the moment he noticed the police"); United States v. Vega, 221 F.3d 789, 799 n.26 (5th Cir.

15

2000)(unprovoked flight is among the relevant contextual considerations in a probable cause evaluation).

Beasley's claim that drugs were being used or sold at the home does not support an inference that the home was in a high crime or heavy narcotic trafficking area, anymore than the tipster's claim that the defendant in J.L. had a gun meant that the bus stop where he could be found was in a high crime area or an area known for arms trafficking. All the officers had to work with in J.L. and in this case was an unadorned claim from an individual whose veracity could not be assessed that an unidentified person may have engaged in criminal activity. While Defendant may have been viewed as fleeing upon seeing the police, unprovoked flight is not enough.

Apart from the lack of any reasonable suspicion, this case is troubling because the actual Terry stop occurred after Deputy Stephens pursued Defendant into the residence, even though Deputy Stephens had the opportunity when he crossed the threshold to have Defendant walk out of the house with him. There is abundant authority for the proposition that "an intrusion *into* a home may not be premised on Terry's reasonable suspicion standard." United States v. Washington, 387 F.3d 1060, 1068 n.8 (9th Cir. 2004)(collecting cases).[7] Indeed, the Supreme Court "has never

_____

[7]There is some authority which holds that a Defendant cannot avoid a Terry stop merely by retreating into his home. See, Rivera v. Washington, 57 Fed. Appx. 558, 562 (4th Cir. 2003)(collecting cases). However, in those cases the stops were upheld because

16

expanded <u>Terry</u> to allow a <u>Terry</u>-stop at an individual's home." <u>Id</u>.; <u>accord</u>, <u>United States v. Johnson</u>, 170 F.3d 708, 714 (7th Cir. 1999). "[I]f the police could demand entry into a person's home or hotel room to investigate suspected criminal activity in situations where they lack a warrant or even probable cause to search or arrest, the Fourth Amendment rule would be swallowed by the <u>Terry</u> exception." <u>United States v. Conner</u>, 127 F.3d 663, 666 n.3 (8th Cir. 1997).

Regardless, <u>Terry</u> makes clear that the suspicion that criminal activity is afoot must be both reasonable and articulable and an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity is insufficient to justify even a brief detention for the purpose of investigation." <u>Terry</u>, 392 U.S. at 27. What is required is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." <u>Cortez</u>, 449 U.S. at 417.

There is no objective manifestation present in this case suggesting Defendant was engaging in criminal activity when the police arrived. The only thing the police possessed was a "hunch" that Defendant may have been the "he" mentioned by the caller. That is simply not enough to detain an individual and certainly not enough to breach the threshold of a home given that "'the physical

_____

prior to entering the homes the officers involved had articulable and reasonable suspicions that the subjects entering the homes had or were about to commit crimes.

17

entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585 (1980)(citation omitted).

**B. Degree of Intrusion**

The Court also concludes the degree of intrusion in this case was not reasonably related in scope to the situation at hand and hence the second prong of the analysis for a Terry stop is not met.

"A Terry stop cannot be excessively intrusive and must be reasonably related in scope and duration to the purposes of the investigation." Bennett v. City of Eastpointe, 410 F.3d 810, 836 (6th Cir. 2005) citing, Berkemer, 468 U.S. at 439. The "scope of the intrusion permitted" in the course of a Terry stop "will vary . . . with the particular facts and circumstances of each case," but in all cases the "detention must be temporary and last no longer than is necessary" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983). In this vein, a court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant[.]" United States v. Sharpe, 470 U.S. 675, 687 (1985).

Recall in this case that Deputy Stephens' stated reason for

18

following Defendant into the house was to assure himself that Defendant did not have a weapon.  While Deputy Stephens was standing at the threshold to the house with his gun drawn, Defendant turned to him and raised his hands.  Defendant also repeatedly requested that they proceed back outside.  Instead of walking him outside and searching him, Deputy Stephens told Defendant to go outside or stand in the doorway and then conducted a "protective sweep."  This "sweep" lasted an inordinate amount of time and its length has not been adequately explained.  It would not have been necessary if Defendant was merely escorted outside as requested.  Simply letting Defendant approach and stepping back outside would have readily dispelled Deputy Stephens' concern that Defendant possessed a gun or would retrieve a gun from inside.[8]

**C.** **Fruit of the Poisonous Tree**

The "fruit of the poisonous tree doctrine "first coined in Nardone v. United States, 308 U.S. 338, 341 (1939)" provides that "evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed."  McClain, 444 F.3d at 564.

---

[8]Deputy Stephens later stated that he was also concerned that others could be inside of the house and could shoot at the officers out front.  While this Court recognizes that a police officer's job is fraught with peril, the suggestion that officers are allowed to enter a house without any basis on the grounds that they could be subjected to gunfire must be rejected.  If the Court were to accept this argument, the Fourth Amendment would be rendered a nullity since officers could enter a home anytime they are within shooting range of a home.

"The exclusionary rule would therefore work to exclude all evidence obtained subsequent to and as a consequence of an illegal search because, as the fruit of a prior illegality, such evidence is tainted[.]" Id.

There are exceptions to the fruit of the poisonous tree doctrine, including where the evidence comes from an independent source, see Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920); where the unlawful search becomes "so attenuated as to dissipate the taint," Nardone, 308 U.S. at 341; where the evidence "would inevitably have been discovered," Nix v. Williams, 467 U.S. 431, 444 (1984); or where evidence is discovered based upon a warrant which is later found to be defective but upon which the officer in good faith relied. United States v. Leon, 468 U.S. 897, 920 (1984). "In determining whether evidence acquired after an illegal entry is inadmissible under the fruit of the poisonous tree doctrine, a court must decide if law enforcement officials obtained this evidence by exploiting the initial illegality or by sufficiently distinguishable methods." United States v. Smith, 386 F.3d 753, 763 (6th Cir. 2004).

In this case the proof clearly shows that the drugs which were found as a result of both the "protective sweep" and later "consensual search" were obtained by exploiting the initial illegal Terry stop. "The exclusionary rule is a judicial remedy that

20

operates 'to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures,' as well as to maintain the integrity of the judicial process." <u>Joshua v. DeWitt</u>, 341 F.3d 430, 450 (6th Cir. 2003). To obtain those purposes, the evidence seized in the residence will be suppressed.

**D.  <u>Standing</u>**

Prior to concluding, the Court addresses one additional argument raised by the Government. The Government asserts that Defendant lacks standing to challenge the initial warrantless entry and search of the residence at 5982 Hickory Grove Road. The Court disagrees.

"It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." <u>United States v. Padilla</u>, 508 U.S. 77, 81 (1993)(emphasis in original). Thus, "[t]he established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." <u>Id</u>. at 82.

21

Case 3:06-cr-00021   Document 25   Filed 11/22/06   Page 21 of 23 PageID #: 88

In this case, the Government argues Defendant has no standing because he did not own the residence – his mother and uncle did. The record as to ownership and residency is not altogether clear. Ms. Martin indicated that she and her brother owned the residence and identified to the officers her and her brother's respective rooms, where they were not permitted to search. She also indicated, however, that both she and her brother owned other residences where they resided and that her son lived at the Hickory Grove residence where the search took place. There was also some suggestion Defendant was living in Antioch, Tennessee at the time of the events at issue in this case.

Despite this conflicting evidence, the Court finds that Defendant has standing to challenge the search. The entirety of the evidence on the issue suggests that at the time of the arrival of the police, Defendant and his cousin Barney Martin were staying at the house with Ms. Martin's permission. Barney Martin testified he and the Defendant had stayed at the house on New Year's Eve and New Year's Day. Under <u>Minnesota v. Olson</u>, 451 U.S. 204 (1981), an overnight guest has standing to challenge the validity of a search. Here, not only had Defendant stayed at least overnight, he availed himself of the use of the home as evidenced by the fact that it was he who pointed out the cocaine in the bedroom laundry basket where the police were not to search. See, <u>United States v. Sissler</u>, 1992

WL 126974 at *3 (6th Cir. 1992)("a natural reading of <u>Olson</u> suggests that an overnight guest's privacy interest in a home is not limited unless the host restricts the guest's movements).    Further, Defendant has standing because *his* Fourth Amendment rights were violated by the unlawful <u>Terry</u> stop. See, <u>Joshua v. Dewitt</u>, 341 F.3d 430, 449 n.6 (6th Cir. 2003)(where detention was unreasonable under the Fourth Amendment, Defendant has standing to challenge any evidence obtained from that detention as fruit of the poisonous tree).

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's "Motion for Suppression of Illegally Seized Evidence" (Docket Entry No. 18) will be granted and the evidence seized from 5982 Hickory Grove Road, Murfreesboro, Tennessee on January 1, 2006 will be suppressed.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

23